Drexel A. Bradshaw (SBN 209584)
Thomas J. O'Brien (SBN 274969)
Bradshaw & Associates, P.C.
One Sansome Street
Thirty-Fourth Floor
San Francisco, CA 94104
Phone: (415) 433-4800
Fax:    (415) 433-4841

Attorneys for Plaintiff and the Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JANE DOE, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>        vs.<br><br>NFL ENTERPRISES LLC dba NATIONAL FOOTBALL LEAGUE, FORTY NINERS FOOTBALL COMPANY LLC, THE OAKLAND RAIDERS LIMITED PARTNERSHIP, CHARGERS FOOTBALL COMPANY LLC, THE LOS ANGELES RAMS LLC, THE ARIZONA CARDINALS FOOTBALL CLUB LLC, ATLANTA FALCONS FOOTBALL CLUB LLC, BALTIMORE RAVENS INC., BUFFALO BILLS LLC, PANTHERS FOOTBALL LLC, CINCINNATI BENGALS INC., THE DALLAS COWBOYS FOOTBALL CLUB LTD., PDB SPORTS LTD. dba DENVER BRONCOS, THE | CASE NO.:<br><br>**CLASS ACTION**<br>**COMPLAINT FOR DAMAGES**<br>**JURY TRIAL DEMANDED** |

1   DETROIT LIONS INC., HOUSTON TEXANS

2   INC., INDIANAPOLIS COLTS INC.,

3   JACKSONVILLE JAGUARS LLC, KANSAS

4   CITY CHIEFS FOOTBALL CLUB INC., MIAMI

5   DOLPHINS LTD., MINNESOTA VIKINGS

6   FOOTBALL LLC, NEW ENGLAND PATRIOTS

7   LLC, THE NEW ORLEANS LOUISIANA

8   SAINTS LIMITED PARTNERSHIP, NEW YORK

9   JETS LLC, PHILADELPHIA EAGLES LLC,

10   SEATTLE SEAHAWKS INC., BUCCANEERS

11   LIMITED PARTNERSHIP dba TAMPA BAY

12   BUCCANEERS, TENNESSEE FOOTBALL INC.,

13   PRO-FOOTBALL INC. dba WASHINGTON

14   REDSKINS,

15            Defendants.

16      Plaintiff Jane Doe, Individually and On Behalf of All Others Similarly Situated (the "Plaintiff"), sues

17   the NFL Enterprises LLC dba National Football League ("NFL"), Forty Niners Football Company LLC

18   "(49ers), The Oakland Raiders ("Raiders"), a California limited partnership, Chargers Football

19   Company LLC ("Chargers"), The Los Angeles Rams LLC ("Rams"), The Arizona Cardinals Football

20   Club LLC ("Cardinals"), Atlanta Falcons Football Club LLC ("Falcons"), Baltimore Ravens Inc.

21   ("Ravens"), a corporation, Buffalo Bills LLC ("Bills"), Panthers Football LLC ("Panthers"), Cincinnati

22   Bengals Inc. ("Bengals"), The Dallas Cowboys Football Club, Ltd. ("Cowboys"), PDB Sports Ltd., dba

23   Denver Broncos ("Broncos"), The Detroit Lions Inc. ("Lions"), Houston Texans Inc. ("Texans"),

24   Indianapolis Colts Inc. ("Colts"), Jacksonville Jaguars LLC ("Jaguars"), Kansas City Chiefs Football

25   Club Inc. ("Chiefs"), Miami Dolphins, Ltd. ("Dolphins"), Minnesota Vikings Football LLC ("Vikings"),

26   New England Patriots LLC ("Patriots"), The New Orleans Louisiana Saints Limited Partnership

27   ("Saints"), New York Jets LLC ("Jets"), Philadelphia Eagles LLC ("Eagles"), Seattle Seahawks LLC

28   ("Seahawks") Buccaneers Limited Partnership dba Tampa Bay Buccaneers ("Buccaneers"), Tennessee

*Complaint —Jane Doe. v. National Football League, et al.*
{00194348;6}

Football Inc. ("Titans"), Pro-Football Inc. dba WASHINGTON ("Redskins"), (collectively "Defendant NFL Member Teams", and with Defendant NFL, collectively "Defendants").  Plaintiff, individually and on behalf of all others similarly situated, complain against Defendants, and each of them, and demand a trial by jury of all issues and for all causes of action allege:

## I.       SUMMARY OF THE ACTION

1.   This class action challenges a conspiracy among Defendants to fix and suppress the compensation of their employees, female athletes colloquially known as "cheerleaders". Without knowledge or consent of employees, Defendant NFL Member Teams' owners and senior executives entered into an agreement or series of agreements to eliminate competition among them for skilled labor employed as "cheerleaders".

2.   The conspiracy included agreements among Defendants to:

    a.   Refrain from recruiting female athletes from fellow Defendant NFL Member Teams;

    b.   Pay female athletes a low, flat wage for each game performed;

    c.   Not pay female athletes for time spent rehearsing;

    d.   Not pay female athletes for time spent on various community outreach events

    e.   Prohibit female athletes from being employed by other professional cheerleading teams, not just within the NFL;

    f.   Prohibit female athletes from discussing their earnings with each other in a further effort to suppress earnings by ensuring female athletes would not become aware of the illegal nature of their employment and compensation, thus further depressing and suppressing the market;

    g.   File with Defendant NFL all female athlete contracts to ensure participation with the conspiracy.

3.   On information and belief, Defendant NFL conspired with the Defendant NFL Member Teams to coordinate, encourage, facilitate, and implement the agreement in order to pay female athletes below fair market value. Defendant NFL did so by requiring Defendant NFL Member teams to file with Defendant NFL all written employment contracts with all non-player employees of NFL member teams, including those of female athletes. This requirement served as a check-and-balance,

and allowed Defendant NFL and Defendant NFL Member Teams to ensure the conspiracy among the Defendant NFL Member Teams to suppress female athlete earnings was enforced.

4. On information and belief, in doing so, Defendants so conspired with the purpose of reducing market competition among female athletes and thus ensuring female athlete earnings remained far below fair market value.

5. Plaintiff is unaware of precisely when this conspiracy was first consummated. However, the conspiracy is continuing, and Defendants committed new and independent overt acts each year, as (1) a new wave of female athletes were hired by Defendant NFL Member Teams; (2) when Defendant NFL Member Teams forced Class members to sign new employment agreements, and (3) Defendant NFL Member Teams filed those employment agreements with the NFL. This renewal of the conspiracy happened most recently prior to the 2016-17 NFL season.

## II.      THE PARTIES

6. This class action is brought by Plaintiff, on behalf of herself, and on behalf of all others similarly situated, who have sustained injuries or incurred damages arising from Defendants' violations of the antitrust and unfair competition laws of the State of California and the United States.

7. Plaintiff Jane Doe, and at all times mentioned herein was, a resident of Santa Clara County, State of California, and is over 18 years of age. Jane Doe is a former employee of Defendant 49ers. Jane Doe worked for the 49ers from approximately July 2013 until February 2014 as a female athlete, colloquially known as a "cheerleader", on the 49ers "Gold Rush Girls" dance team. Jane Doe is a trained well-rounded and multi-disciplinary dancer who spent nearly two decades training to be a ballet dancer before being employed as a female athlete with the 49ers. Jane Doe was injured in her business or property by reason of the violations alleged herein.

8. On information and belief, Defendant NFL, which maintains its offices at 345 Park Avenue, New York, New York, is an unincorporated association consisting of separately owned professional football teams that operate out of many different cities and states in this country. The NFL is engaged in interstate commerce in the business of promoting, operating, and regulating the league and its member teams. At all times relevant, Defendant NFL did business and availed itself of jurisdiction in this district through substantial contacts, including through participating in football

games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

9. On information and belief, Defendant 49ers is a limited liability company, at all times relevant with its principle place of business located in San Francisco County and/or Santa Clara County, State of California, and doing business in, San Francisco County and/or Santa Clara County, State of California.

10. On information and belief, Defendant Raiders is a limited partnership, at all times relevant with its principal place of business in Alameda County, State of California, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

11. On information and belief, Defendant Chargers is a limited liability company, at all times relevant with its principal place of business in San Diego County, State of California, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

12. On information and belief, Defendant Rams is a limited liability company, at all times relevant with its principal place of business in Los Angeles County, State of California and/or State of Missouri, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

13. On information and belief, Defendant Cardinals is a limited liability company, at all times relevant with its principal place of business in State of Arizona, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

14. On information and belief, Defendant Falcons is a limited liability company, at all times relevant with its principal place of business in State of Georgia, and doing business in and availing itself of

_Complaint —Jane Doe. v. National Football League, et al._
{00194348;6}

jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

15. On information and belief, Defendant Ravens is a corporation, at all times relevant with its principal place of business in State of Maryland, and doing business in and availing itself of jurisdiction in this district through substantial contacts including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

16. On information and belief, Defendant Panthers is a limited liability company, at all times relevant with its principal place of business in State of North Carolina, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

17. On information and belief, Defendant Bengals is a corporation, at all times relevant with its principal place of business in State of Ohio, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

18. On information and belief, Defendant Cowboys is a limited liability company, at all times relevant with its principal place of business in State of Texas, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

19. On information and belief, Defendant Broncos is a limited liability company, at all times relevant with its principal place of business in State of Colorado, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

20. On information and belief, Defendant Lions is a corporation, at all times relevant with its principal place of business in State of Michigan, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

21. On information and belief, Defendant Texans is a corporation, at all times relevant with its principal place of business in State of Texas, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

22. On information and belief, Defendant Colts is a corporation, at all times relevant with its principal place of business in State of Indiana, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

23. On information and belief, Defendant Jaguars is a limited liability company, at all times relevant with its principal place of business in State of Florida, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

24. On information and belief, Defendant Chiefs is a corporation, at all times relevant with its principal place of business in State of Missouri, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

25. On information and belief, Defendant Dolphins is a limited liability company, at all times relevant with its principal place of business in State of Florida, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football

1  games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of

2  San Francisco, State of California, as alleged herein.

3  26. On information and belief, Defendant Vikings is a limited liability company, at all times relevant

4  with its principal place of business in State of Minnesota, and doing business in and availing itself

5  of jurisdiction in this district through substantial contacts, including through participating in football

6  games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of

7  San Francisco, State of California, as alleged herein.

8  27. On information and belief, Defendant Patriots is a limited liability company, at all times relevant

9  with its principal place of business in Commonwealth of Massachusetts, and doing business in and

10  availing itself of jurisdiction in this district through substantial contacts, including through

11  participating in football games, selling merchandise, and by engaging in antitrust activities affecting

12  commerce in County of San Francisco, State of California, as alleged herein.

13  28. On information and belief, Defendant Saints is a limited partnership, at all times relevant with its

14  principal place of business in State of Louisiana, and doing business in and availing itself of

15  jurisdiction in this district through substantial contacts, including through participating in football

16  games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of

17  San Francisco, State of California, as alleged herein.

18  29. On information and belief, Defendant Jets is a limited liability company, at all times relevant with

19  its principal place of business in State of New Jersey, and doing business in and availing itself of

20  jurisdiction in this district through substantial contacts, including through participating in football

21  games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of

22  San Francisco, State of California, as alleged herein.

23  30. On information and belief, Defendant Eagles is a limited liability company, at all times relevant

24  with its principal place of business in Commonwealth of Pennsylvania, and doing business in and

25  availing itself of jurisdiction in this district through substantial contacts, including through

26  participating in football games, selling merchandise, and by engaging in antitrust activities affecting

27  commerce in County of San Francisco, State of California, as alleged herein.

28  31. On information and belief, Defendant Seahawks is a corporation, at all times relevant with its

principal place of business in State of Washington, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

32. On information and belief, Defendant Buccaneers is a limited partnership, at all times relevant with its principal place of business in State of Florida, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

33. On information and belief, Defendant Titans is a corporation, at all times relevant with its principal place of business in State of Tennessee, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein.

34. On information and belief, Defendant Redskins is a corporation, at all times relevant with its principal place of business in Commonwealth of Virginia, and doing business in and availing itself of jurisdiction in this district through substantial contacts, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in County of San Francisco, State of California, as alleged herein

35. Plaintiffs are ignorant as to the exact relationship between, and relative degree of fault for the acts and omissions alleged in this Complaint against Defendants, and will amend this complaint to more accurately allege such names and capacities when ascertained.  Based on the foregoing, and with respect to the acts and omissions alleged in this complaint, Plaintiffs will refer throughout this complaint collectively to the "Defendants" if and when Plaintiffs cannot at this time, through the exercise of reasonable diligence, determine whether such acts and omissions are those of the known Defendants or those of a yet unascertained Doe Defendant.

36. Whenever this Complaint refers to any corporation's act, deed, or transaction, it means that such corporation engaged in the act, deed, or transaction by or through its officers, directors, agents,

employees, or other representatives while they actively were engaged in the management, direction, control, or transaction of its business or affairs.

## III.   JURISDICTION AND VENUE

37. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)(A), because (1) the amount in controversy exceeds $5 million USD, exclusive of interest and costs; (2) the class has over one hundred (100) members; and (3) Plaintiff is a citizen of a state (California) different from at least one of the defendants.

38. Venue is proper in the Northern District of California because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district or affected commerce in this district, and because Defendants have availed themselves of personal jurisdiction in this district through substantial contacts in this district, including through participating in football games, selling merchandise, and by engaging in antitrust activities affecting commerce in this district.

39. Intra-district assignment to the San Francisco Division is proper pursuant to Local Rule 3-2(b) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in the County of San Francisco, State of California, and affected commerce in County of San Francisco, State of California.

## IV.   CHOICE OF LAW

40. California law applies to the claims of Plaintiff and all Class members. Application of California law is constitutional, and California has a strong interest in deterring antitrust activities of resident corporations and compensating those harmed by activities occurring in, emanating from, and affecting commerce within California.

41. California commerce was greatly affected by the conspiracy agreements alleged herein. California is home to more Defendant NFL Member Teams than any other state. Further, During the relevant time period, Defendant NFL Member Teams played games in California, sold merchandise in California, and broadcast games in California.

42. Plaintiff and Class members were injured by conduct occurring in and emanating from California.

43. For these reasons, among others, California's substantial interests exceed those of any other state.

///

_Complaint —Jane Doe. v. National Football League, et al._
{00194348;6}

## V.      CLASS ACTION ALLEGATIONS

44. Plaintiff brings this action on behalf of herself and all others similarly situated (the "Class") pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a), 23(b)(1)(A), and 23(b)(1)(B).

45. The Class is defined as follows:

> All natural persons employed by Defendant NFL Member Teams as female athletes, colloquially known as "cheerleaders", within four years prior to the date of filing of this Complaint.

46. To the extent equitable tolling operates to toll claims by the Class against Defendants, the Class Period should be adjusted accordingly.

47. Plaintiff does not, as yet, know the exact size of the Class because such information is in the exclusive control of Defendants. However, upon information and belief, the Class includes several thousand people.   Under information and belief, Class members are geographically dispersed throughout California and the United States. Joinder of all Class members is thus not practicable.

48. The exact identities of members of the Class may be ascertained via reference to Defendants' records, appropriately noticed mailings, telephone calls and in-person meetings with other members of the Class.   The identities of other persons on whose behalf this action is brought may be ascertained by the publishing of notices in appropriate local newspapers and similar publications.

49. The questions of law or fact common to the Class included but are not limited to:

> a.   Whether Defendants' conduct violated the Sherman Act and/or Cartwright Act;
>
> b.   Whether Defendants' conspiracy agreements, or any of them, as alleged herein, constitute a *per se* violation of the Sherman Act and/or Cartwright Act;
>
> c.   Whether Defendants fraudulently concealed their conduct;
>
> d.   Whether Defendants' conspiracy and associated agreements restrained trade, commerce, or competition for skilled labor among Defendants;
>
> e.   Whether Plaintiff and the Class suffered antitrust injury or were threatened with injury;
>
> f.   The type and measure of damages suffered by Plaintiff and the Class;

50. These and other questions of law and fact are common to the Class, and predominate over any

questions affecting only individual Class members.

51. Plaintiff's claims are typical of the claims of the Class.

52. Plaintiff will fairly and adequately represent the interests of the Class and have no conflict with the interests of the Class.

53. Plaintiff has retained competent counsel experienced in antitrust litigation and class action litigation to represent herself and the Class.

54. This class action is superior to any alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action by class action. By contract, prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI. FACTUAL ALLEGATIONS

### A. Trade and Commerce.

55. During the Class Period, Defendants employed Class members in California and throughout the United States, including this judicial district.

56. Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

57. Defendants' conduct also substantially affected commerce within and throughout the State of California and caused antitrust injury within and throughout the State of California.

### B. Background.

58. Plaintiff, and those similarly situated, are persons employed by Defendant NFL Member Teams, colloquially known as "cheerleaders" (hereinafter "female athletes"). Class members comprise various dance troupes affiliated with and operated by Defendant NFL Member Teams. Plaintiff Jane Doe was specifically employed as a female athlete by Defendant 49ers from approximately May 2013 through February 2014.

59. On information and belief, Defendant NFL is a massive conglomerate of individually owned Defendant NFL Member Teams.

60. On information and belief, Defendant NFL and Defendant NFL Member Teams are, collectively, a

multi-billion dollar per year business. Over the last few decades, NFL revenue and profits have skyrocketed, as television and radio contracts keep pace with seemingly unending growth in fan interest. Forbes Magazine projected the NFL's revenues would exceed $13.3 billion dollars in 2016. That number is halfway to NFL Commissioner Roger Goodell's publicly stated goal of $25 billion by the year 2027, and up from $8.5 billion when he made the proclamation back in 2010.

61. On information and belief, at least an estimated $5 billion of annual league revenue currently comes from television rights fees, the cost of which is in part passed on to the viewing public in subscriber fees and paid advertising.

62. On information and belief, Forbes Magazine now estimates Defendant NFL Member Teams are worth an average of $2.34 billion.

63. On information and belief, in concert with that rise in value, NFL male athlete salaries have skyrocketed. In 2016, NFL players collectively earned approximately $6.4 billion among 1,800 persons. This averages approximately $1,300,000.00 per male athlete. Many male athletes earn far above that amount. Even practice squad players, who do not perform in NFL games but merely serve as proverbial practice dummies for players that do, earn at least $117,300.00 per season. Most insulting of all, on information and belief, NFL mascots, who dress in oversized costumes and walk around the stadium during games just ten times per year, and with no discernible skill, are paid anywhere from $25,000.00 to $65,000.00 per year, and receive retirement benefits. It is no coincidence the only group of employees paid well below market value were "cheerleaders" – a group entirely comprised of women.

64. On information and belief, while the NFL has no competitor professional football league, Defendant NFL Member Teams are without question in direct competition with each other. Defendant NFL Member Teams compete on the football field; they compete in acquiring players and coaches who will compete on the football field; they compete for executives who both hire players and coaches and run the business side of each Defendant NFL Member Team; and indeed Defendant NFL Member Teams compete for female athletes, as alleged herein.

65. On information and belief, Defendant NFL Member Teams have employed female athletes since at least 1954, when the Baltimore Colts employed women as female athletes as part of its Baltimore

Colts Marching Band.

66. On information and belief, over the last fifty years, female athletes have grown in importance to Defendant NFL Member Teams. During the relevant time period, twenty-six[1] (26) of the thirty-two (32) NFL member teams employed "cheerleading teams". Many of those cheerleading teams are given demeaning names, such as the Buffalo Jills (recently defunct), the Oakland Raiderettes, and the Seattle Sea Gals.

67. On information and belief, female athletes are almost uniformly highly skilled dancers with years and even decades of training. Further, although the stereotype is female athletes are simply beautiful women who stand on the sidelines to serve as "eye-candy" to fans, female athletes serve a far greater and more valuable purpose for Defendant NFL Member Teams.

68. On information and belief, in addition to performing at NFL games, Defendant NFL Member Teams utilize female athletes on their respective cheerleading teams for community outreach. Female athletes are required, and in the past often without pay, to participate in charity and promotional events, among other means of community outreach. As NFL male athlete pay has skyrocketed over the years, NFL teams required relatable but popular team representatives to go into their communities to meet fans and serve as the smiling face of the team. Defendant NFL Member Teams increasingly utilize female athletes for this purpose.

69. On information and belief, Defendant NFL Member Teams often require their female athletes to take part in photoshoots. The results of those photoshoots are often utilized to create videos, calendars and other merchandise that NFL teams sell to fans, without providing additional compensation to the female athletes. NFL female athletes are thereby required to relinquish rights to their likeness without compensation.

70. On information and belief, NFL female athletes are so sought after they are, collectively, one of the most popular entertainment groups to perform for the United States Armed Forces' USO shows. In 2007, female athletes for the Buffalo Jills traveled to and performed in the war zone in Iraq. In 1996, female athletes for the Defendant 49ers (known as the San Francisco Gold Rush) helicoptered

---

[1] Defendant Bills disbanded their cheerleading team just prior to the 2014 season, but did employ prospective Class members during the Class period.

*Complaint —Jane Doe. v. National Football League, et al.*
{00194348;6}

1   into war-torn Bosnia to perform a USO show.

71. On information and belief, female athletes are also heavily utilized in NFL television broadcasts, as television networks air footage of female athletes performing throughout each televised game. Defendants and the television networks utilize these shots of female athletes to show the "pomp and circumstance" of the sport, and to reinforce the idea NFL games are a spectacle not to be missed.

72. In short, female athletes are heavily utilized by Defendant NFL Member Teams to serve as a relatable and often lucrative face of the teams.

**C. Conspiracy to Suppress Earnings**.

73. In a properly functioning and lawfully competitive labor market, competing employers compete for qualified employees. Such competition fosters fair earnings for employees, as the best employees will fetch the highest earnings, and create upward pressure on employee compensation.

74. However, on information and belief, Defendants conspired to ensure this competition did not occur for its female athletes, thus resulting in artificially low compensation.

75. On information and belief, despite their importance to Defendant NFL Member Teams, historically, Defendant NFL Member Teams paid their employed female athletes poorly. There have been a rash of lawsuits filed over the last few years alleging that various NFL teams paid their female athletes below the legally-mandated minimum wage. Plaintiff here alleges something vastly more sinister.

76. On information and belief, Plaintiff alleges Defendant NFL Member Teams actively conspired to suppress female athlete earnings by agreeing to pay female athletes below fair market value and by agreeing to refrain from recruiting female athletes from fellow Defendant NFL Member Teams.

77. On information and belief, during the relevant time period, no Defendant NFL Member Team ever attempted to recruit a female athlete from another Defendant NFL Member Team, even those teams located in the same geographic market.

78. In addition to this agreement, Defendant NFL Member Teams prohibited those female athletes from seeking similar employment with other professional cheerleading teams, not just within the NFL, thus enforcing the illegal agreement to suppress earnings. Notably, senior executives, including but not limited to heads of each Defendant NFL Member Team's "cheerleading" team, are permitted and do routinely seek and obtain employment with other NFL Member Teams.

79. The conspiracy began with an agreement between senior executives of Defendant NFL Member Teams to eliminate competition for female athletes with the intent and effect of suppressing the compensation and mobility of female athletes. Those senior executives include Defendant NFL Member Team owners, high ranking management officials, and heads of each Defendant NFL Member Team's "cheerleading" team. These agreements were made at various meetings throughout the year where said senior executives collectively gather. These meetings include annual NFL owner meetings, the NFL scouting combine, the NFL Draft, the Super Bowl, the Pro Bowl, trade shows, and even conference calls among senior executives, among other events.

80. Each Defendant NFL Member Team, through its senior executives as alleged herein, agreed to

    a. Suppress earnings for female athletes well below their fair market value;

    b. Refrain from recruiting female athletes from fellow Defendant NFL Member Teams;

    c. Pay female athletes a low, flat wage for each game performed;

    d. Not pay female athletes for time spent rehearsing;

    e. Not pay female athletes for time spent on various community outreach events

    f. Prohibit female athletes from being employed by other professional cheerleading teams, not just within the NFL;

    g. Prohibit female athletes from discussing their earnings with each other in a further effort to suppress earnings by ensuring female athletes would not become aware of the illegal nature of their employment and compensation, thus further depressing and suppressing the market;

    h. File with Defendant NFL all female athlete contracts to ensure participation in the conspiracy.

81. On information and belief, Defendant NFL conspired with the Defendant NFL Member Teams to coordinate, encourage, facilitate, and implement the agreement to pay female athletes below fair market value. Defendant NFL did so by requiring Defendant NFL Member teams to file with the NFL all written employment contracts with all non-player employees of NFL member teams, including those of female athletes.

82. On information and belief, this requirement served as a check-and-balance, and allowed Defendant

NFL and Defendant NFL Member Teams to ensure the conspiracy among the Defendant NFL Member Teams to suppress female athlete earnings was enforced.

83. On information and belief, this requirement was and is set forth by the NFL Constitution and Bylaws. Furthermore, the NFL Constitution and Bylaws regulate specific terms and conditions which must be present in all employment contracts between NFL member teams and their non-player employees, including female athletes.

84. On information and belief, in doing so, Defendant NFL conspired with Defendant NFL Member Teams to suppress market competition among female athletes and ensure female athlete earnings remained far below fair market value.

85. Defendants entered into, implemented, and policed these agreements with knowledge of the other Defendants' participation. These concerted efforts to restrict the movement and earnings of female athletes amounted to and were an intentional unreasonable restraint of trade which effects local, state, and interstate commerce.

86. Plaintiff is unaware of precisely when this conspiracy was first consummated. However, the conspiracy is continuing, and Defendants committed new and independent overt acts each year, as (1) a new wave of female athletes were hired by Defendant NFL Member Teams; (2) when Defendant NFL Member Teams forced Class members to sign new employment agreements, and (3) Defendant NFL Member Teams filed those employment agreements with the NFL. This renewal of the conspiracy happened most recently prior to the 2016-17 NFL season.

**D. Effects of Defendants' Conspiracy on Plaintiff and the Class**.

87. On information and belief, until the recent lawsuits against Defendant NFL Member Teams, female athletes were largely paid a flat fee per game. For example, Defendant Raiders paid its female athletes a flat fee of $125 game, and did not compensate female athletes time spent rehearsing or engaged in mandatory community events, along with other time that should have been compensated. Similarly, Defendant Buccaneers paid its female athletes a flat fee of $100 per game, did not compensate for rehearsals, and rarely paid a low hourly wage for community events. Defendant Bengals paid its cheerleaders a flat fee of $90 per game, and did not compensate them for rehearsals or community events. Finally, Defendant Bills did not pay its female athletes at all for

1   games or rehearsals, and rarely paid them for community events.

2   88. Perhaps even more insultingly, Defendant NFL Member Teams required female athletes auditioning

3       for the team to pay approximately $25 per woman just to tryout.

4   89. Since these lawsuits began being filed, Defendant NFL Member Teams generally raised their

5       earnings for female athletes to minimum wage.

6   90. On information and belief, Defendant NFL Member Teams universally paid its cheerleaders the

7       same or nearly the same amount per game, and likewise did not compensate female athletes for time

8       spent rehearsing or engaged in mandatory community outreach events, nor other time that should

9       have been compensated.

10  91. On information and belief, generally, NFL Member Teams required female athletes to work

11      approximately three-hour rehearsals three times per week from approximately the beginning of May

12      through the end of the season[2], generally around the last week of December, and longer if the team

13      made the NFL playoffs. Female athletes worked ten home games per year at approximately 9-hours

14      per day, and a conservative estimate of an average of twenty appearances per year in additional

15      time, including photo shoots and community events.

16  92. On information and belief, the true fair market value for female athletes may have been and may

17      continue to be approximately $100,000.00 per female athlete, per year, based on consultations with

18      industry experts.

19  93. On information and belief, the Dancers Alliance, a union for professional dancers and

20      choreographers requires earnings for professional dancers as follows, in pertinent part[3]:

21              **Dancers Alliance Rates**

22              Minimum Rates For Live Shows, Industrials & Non-Union Music Videos

23              **Rehearsals**:  Agency fees apply on top of these rates

24                      $175 | 1-4 hours (anything over 4 hours = time and a half)

25                      $250 | 4- 8 hours (anything over 8 hours = time and a half)

26                      Also note, if a rehearsal is on a travel day, both fees apply.

27

28  [2] Estimated at approximately 100 rehearsals/practices
    [3] Source: https://www.dancersalliance.org/da-rates

*Complaint —Jane Doe. v. National Football League, et al.*
*{00194348;6}*

**Show**

$500 minimum / show

Rate for additional same-day shows is negotiable

Also note, if show is on a travel day, both fees apply.

**Per Diem**

Depending on the company policy, it can be distributed on the first day of the job, or inside your check.

Domestic Travel: $65 / day

International Travel: $75 / day.

94. At the rates listed by Dancers Alliance, female athletes employed by Defendant NFL Member Teams would have been compensated a minimum of approximately $26,000.00 per year for rehearsals, performances, and appearances, instead of the approximately $1,000.00-1,500.00 per year they were generally paid. These estimated minimums do not include possible per diems.

95. The Dancers Alliance further provides:

"An additional fee will be negotiated if video (or portions of video) that embodies performer's likeness is used for commercial, television, film, dvd, concert tour usage, Netflix, Hulu, YouTube/YouTube Red, Vevo, social media or any other promotional media.  Usage fees are calculated based on the total budget of the video.  Usage fees include all ancillary usage for music videos including documentary, "making of" specials, dvds, film trailers, social media/online footage, or concert tour usage.  Usages excluded from this fee are product-related commercial usage, usage that falls under union jurisdiction (such as the use of music video within a feature film, non-promotional television program, etc.)  print usage (including, but not limited to cover art) and "lifts" into other titled music videos.  This also includes any medium now known or created in the future."

96. However, NFL female athletes were required to sign over to Defendant NFL Member Teams the right to use their likeness in promotional and retail materials, with no compensation. The value of each female athlete's likeness in this context is unknown to Plaintiff at this time. However, the

value to Plaintiffs would be, at a minimum, in line with rates for likeness use and residual likeness use under the Screen Actors Guild-American Federation of Television and Radio Artists ("SAG-AFTRA") agreements, which can be very significant figures. Class member likenesses are used throughout television broadcasts, commercials for the NFL, and in other contexts. Additionally, Defendant NFL Member teams are believed to make significant profits selling female athletes' likenesses in calendars, videos, posters, and more. For example, as of the date of the filing of this complaint, Defendant NFL's website was selling calendars featuring NFL female athletes for as much as $22.99. In 2003, Forbes magazine estimated cheerleaders for Defendant NFL Member Teams garner at least $1 million in revenue per team per year. Given that estimate was made fifteen years ago, those revenue numbers are significantly higher at all times relevant to this complaint.

97. Additionally, the value of female athletes as the face of the franchise to each Defendant NFL Member Team's community is difficult to quantify, but certainly contributed to the fair market value of each Class member. As alleged above, consultations with industry experts suggest the fair market value of each female athlete to be approximately $100,000.00 per year.

98. As alleged herein, on information and belief, Defendant NFL Member Teams conspired to keep female athlete compensation low. As part of this conspiracy, Defendant NFL Member Teams agreed to and did use fear and intimidation to induce compliance and acceptance of suppressed earnings by female athletes. Female athletes were told by Defendant NFL Member teams and their agents they were lucky to be chosen, should be grateful and could be quickly replaced if they failed to perform in any way.

99. Plaintiff and each member of the Class were harmed by each and every agreement herein alleged. Defendants' conspiracy was an ideal tool to suppress employee compensation. While certain Defendant NFL Member Teams are located in the same market (e.g., the 49ers and the Raiders) and the effects of antitrust activity between those two Defendants is thus obvious, the effects of Defendants' agreement were far more reaching.  For example, a female athlete of Defendant 49ers would be extremely unlikely to apply for a position with Defendant Cowboys. Such a move would require the female athlete to spend money on airfare and lodging, possibly costing over $1,000.00, just to attend auditions in Dallas, Texas. Even if the female athlete was then selected by Defendant

Cowboys, she would then have to spend many thousands of dollars to uproot her life and relocate to Dallas, Texas. In return, she would be compensated only around $1,000.00 for the entire season. NFL Member Teams thus used the suppression of earnings to suppress Class member mobility, which in turn reinforced the suppression of earnings.

**FIRST CLAIM FOR RELIEF**

**(VIOLATIONS OF THE CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16720)**

**(AGAINST ALL DEFENDANTS)**

100.   Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendants as follows:

101.   Defendants entered into and engaged in an unlawful trust in restraint of trade and commerce, as described above, in violation of California Business and Professions Code section 16720 ("Cartwright Act"). Beginning no later than January 2013 and continuing through at least January 2017, Defendants engaged in continuing and annually renewed trusts in restraint of trade and commerce in violation of the Cartwright Act.

102.   Defendants' trusts have included concerted action and undertakings among the Defendants with the purpose of (a) fixing the compensation of Plaintiffs and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

103.   As a direct and proximate result of Defendants' efforts to restrain trade, eliminate competition, and suppress earnings, members of the class have suffered injury to their property and have been deprived of the benefits of free and fair competition.

104.   The unlawful trust among Defendants has affected Plaintiff and the Class members in ways including but not limited to the following:

        a.   Competition among Defendants for skilled labor has been suppressed, restrained, and eliminated; and

        b.   Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of Defendants' unlawful trust, and as a result, have been injured in their property and have suffered damages

*Complaint —Jane Doe. v. National Football League, et al.*
{00194348;6}

in an amount according to proof at trial. Plaintiff estimates total actual damages to be between approximately $100,000,000.00 to $300,000,000.00 to the Class during the Class Period.

105.    Plaintiff and Class members are "persons" within the meaning of the Cartwright Act, as defined in the Cartwright Act.

106.    The acts done by each Defendant as part of and in furtherance of the conspiracy, alleged herein, were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

107.    Defendants' agreements and conspiracy are *per se* violations of the Cartwright Act. Alternatively, these horizontal and vertical restraints of trade, as alleged, are *prima facie* anticompetitive under the rule of reason analysis.

108.    Plaintiff and the Class were thereby injured, and will continue to be injured, in their business and property through suppressed earnings, and fewer opportunities to which they would have had access, as a direct and indirect result of Defendants' antitrust activities.

**WHEREFORE**, Plaintiff and the Class pray for judgment as follows:

        a.    For actual damages in an amount according to proof;

        b.    For trebled damages, pursuant to statute;

        c.    For reasonable attorney's fees and costs of suit, pursuant to statute; and

        d.    For such other and further relief as the court deems just and proper.

## SECOND CLAIM FOR RELIEF

## (VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1)

## (AGAINST ALL DEFENDANTS)

109.    Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint, and further alleges against Defendants as follows:

110.    Defendants entered into and engaged in unlawful agreement(s) in restraint of trade and commerce, as described above, in violation of Section 1 of the 15 U.S.C. § 1 ("Sherman Act"). Beginning no later than January 2013 and continuing through at least January 2017, Defendants

engaged in continuing trusts in restraint of trade and commerce in violation of Section 1 of the Sherman Act.

111.    Defendants' trusts have included concerted action and undertakings among the Defendants with the purpose of (a) fixing the compensation of Plaintiffs and the Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

112.    As a direct and proximate result of Defendants' efforts to restrain trade, eliminate competition, and suppress earnings, members of the class have suffered injury to their property and have been deprived of the benefits of free and fair competition.

113.    The unlawful trust among Defendants has effected Plaintiff and the Class members in ways including but not limited to the following:

      a.    Competition among Defendants for skilled labor has been suppressed, restrained, and eliminated; and

      b.    Plaintiff and Class members have received lower compensation from Defendants than they otherwise would have received in the absence of Defendants' unlawful trust, and as a result, have been injured in their property and have suffered damages in an amount according to proof at trial. Plaintiff estimates total actual damages to be between approximately $100,000,000.00 to $300,000,000.00 to the Class during the Class Period.

114.    The acts done by each Defendant as part of and in furtherance of the conspiracy, alleged herein, were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

115.    Defendants' agreements and conspiracy are *per se* violations of the Section 1 of the Sherman Act. Alternatively, these horizontal and vertical restraints of trade, as alleged, are *prima facie* anticompetitive under the rule of reason analysis.

116.    Plaintiff and the Class were thereby injured, and will continue to be injured, in their business and property through suppressed earnings, and fewer opportunities to which they would have had access, as a direct and indirect result of Defendants' antitrust activities.

**WHEREFORE**, Plaintiff and the Class pray for judgment as follows:

a.   For actual damages in an amount according to proof;

b.   For trebled damages, pursuant to statute;

c.   For reasonable attorney's fees and costs of suit, pursuant to statute; and

d.   For such other and further relief as the court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff on behalf of herself and Class members, prays this Court enter judgment on her behalf and on behalf of the Class, by adjudging and decreeing that:

117.   This action may be maintained as a class action, with Plaintiff as the designated Class representative and her counsel as Class counsel;

118.   Defendants have engaged in trust, contract, combination, or conspiracy in violation of and California Business and Professions Code 16750(a) and Section 1 of the Sherman Act, and that Plaintiff and the members of the Class have been damaged and injured in their business and property as a result of these violations;

119.   The alleged combinations and conspiracy be adjudged and decreed to be *per se* violations of the Cartwright Act and Sherman Act;

120.   Plaintiff and Class members recover threefold the damages determined to have been sustained by them as a result of Defendants' conduct, as alleged herein, and that judgment be entered against Defendants for the amount so determined;

121.   For prejudgment and post-judgment interest;

122.   For attorneys' fees;

123.   For costs of suit;

124.   For such other and further relief as the Court may deem just and proper.

///

///

///

///

///

///

## DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demand a jury trial for all claims and issues so triable.

Dated: January 31, 2017

BRADSHAW & ASSOCIATES, P.C.

By: _____
Drexel A. Bradshaw (State Bar No. 209584)
Thomas J. O'Brien (State Bar No. 274969)
Attorneys for Plaintiffs and the Proposed Class

Complaint —Jane Doe. v. National Football League, et al.
{00194348;6}