Sonya D. Winner (Bar No. 200348)
swinner@cov.com
Joanne Sum-Ping (Bar No. 296552)
jsumping@cov.com
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, California 94111-5356
Telephone:  (415) 591-6000
Facsimile:  (415) 591-6091

Derek Ludwin (*pro hac vice pending*)
dludwin@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone:  (202) 662-5429
Facsimile:  (202) 778-5429

Attorneys for Defendants

Kenneth G. Hausman (Bar No. 57252)
kenneth.hausman@apks.com
David J. Reis (Bar No. 155782)
david.reis@apks.com
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400

Attorneys for Defendant The Oakland Raiders

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| KELSEY K., individually and on behalf of all others similarly situated, | Civil Case No.: 3:17-CV-00496-WHA |
| Plaintiffs, | **NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT** |
| v. | Date:  May 18, 2017 |
| NFL ENTERPRISES LLC dba NATIONAL FOOTBALL LEAGUE, *et al.*, | Time:  8:00 a.m. |
| Defendants. | Dept:  Courtroom 8 |
| | Judge: Honorable William Alsup |

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................. 1

II.    ALLEGATIONS OF THE COMPLAINT.............................................................. 2

III.   ARGUMENT ..................................................................................................... 4

      A.     Plaintiff's Conspiracy Allegations Fail to Satisfy the *Twombly* Standard.............. 5

            1.     The Complaint Pleads No Facts Relating to the Alleged Conspiracy. ............................................................................... 5

            2.     Plaintiff's Allegation that the NFL Received Copies of Cheerleader Contracts Cannot Establish a Conspiracy to Fix the Compensation of Cheerleaders. ........................................................ 7

            3.     Plaintiff Has Not Alleged a Plausible Basis for Inferring a Conspiracy Based on Parallel Conduct........................................ 7

                a)     Plaintiff Has Not Pled Parallel Conduct. ....................................... 8

                b)     Plaintiff Fails to Plead Any Plus Factors. ...................................... 9

      B.     Plaintiff's Cartwright Claim Fails Under Settled California Law. ....................... 11

IV.   CONCLUSION............................................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Needle, Inc. v. Nat'l Football League*,
    560 U.S. 183 (2010)................................................................................................. 13

*Arista Records, LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ...................................................................................... 5

*B & R Supermarket, Inc. v. Visa, Inc.*,
    2016 WL 5725010 (N.D. Cal. Sept. 30, 2016) ............................................... *passim*

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................... *passim*

*Blantz v. California Dep't of Corr. & Rehab.*,
    727 F.3d 917 (9th Cir. 2013) ..................................................................................... 5

*City of Oakland v. Oakland Raiders*,
    174 Cal. App. 3d 414 (1985) ................................................................................... 13

*City of San Jose v. Office of the Comm'r of Baseball*,
    776 F.3d 686 (9th Cir. 2015) ................................................................................... 12

*City of San Jose v. Office of the Comm'r of Baseball*,
    2013 WL 5609346 (N.D. Cal. Oct. 11, 2013)........................................................... 12

*Dang v. San Francisco Forty Niners, Ltd.*,
    2014 WL 4275627 (N.D. Cal. Aug. 29, 2014) .......................................................... 13

*Dimidowich v. Bell & Howell*,
    803 F.2d 1473, 1476-77 (9th Cir. 1986) ............................................................ 4, 12

*Hebert v. Los Angeles Raiders, Ltd.*,
    23 Cal. App. 4th 414 (1994) .................................................................................... 12

*In re Citric Acid Litig.*,
    191 F.3d 1090, 1098 (9th Cir. 1999) ......................................................................... 6

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......................................................... *passim*

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ..................................................................... 2, 6, 7, 9

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ........................................................................ *passim*

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*,
   795 F.3d 1124 (9th Cir. 2015) ................................................................. 9

*Ove v. Gwinn*,
   264 F.3d 817 (9th Cir. 2001) ................................................................... 4

*Park v. Thompson*,
   2017 WL 971806 (9th Cir. Mar. 14, 2017)............................................... 5

*Partee v. San Diego Chargers Football Co.*,
   34 Cal. 3d 378 (1983) ...................................................................... 12, 13

*Universal Grading Serv. v. eBay, Inc.*,
   563 F. App'x 571 (9th Cir. 2014) .......................................................... 11

*Universal Grading Serv. v. eBay, Inc.*,
   2012 WL 70644 (N.D. Cal. Jan. 9, 2012)............................................... 11

*Valley Bank of Nevada v. Plus Sys., Inc.*,
   914 F.2d 1186 (9th Cir. 1990) ............................................................... 12

*Wainwright v. Goode*,
   464 U.S. 78 (1983) ................................................................................ 12

**Statutes**

15 U.S.C. § 1 ................................................................................... *passim*

Cal. Bus. & Prof. Code § 16720 ...................................................... *passim*

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 18, 2017, at 8:00 a.m., or as soon thereafter as available, in the courtroom of the Honorable William Alsup, located at 450 Golden Gate Avenue, Courtroom 8, 19th Floor, San Francisco, California 94102, Defendants NFL Enterprises LLC *et al.* will and hereby do move for an order dismissing plaintiff's complaint (Dkt. No. 1).

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the pleadings and papers on file in this action, any other such matters of which the Court may take judicial notice, the arguments of counsel, and any other matter that the Court may properly consider.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Plaintiff Kelsey K. accuses defendants of "conspir[ing] … to fix and suppress the compensation" of "female athletes colloquially known as 'cheerleaders.'"  Complaint ¶ 1.  She asserts claims under the Sherman Act, 15 U.S.C. §1, and the California Cartwright Act, Cal. Bus. & Prof. Code § 16720.  Plaintiff does not, however, allege any facts to support these claims.  Although repeating her conclusory allegation of "conspiracy" over and over and over again, plaintiff's complaint alleges no facts that, if proven, would establish either the existence of an agreement or that any such agreement in fact suppressed wages paid to cheerleaders.

The Supreme Court clarified the pleading standard for a civil antitrust claim in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  *Twombly* established that, to survive a motion to dismiss, an antitrust plaintiff's claims must be supported by pleading of *facts* sufficient to provide "plausible grounds to infer an agreement" to restrain trade.  *Id.* at 556.  This requirement cannot be satisfied by mere repetition, nor by "a conclusory allegation of agreement at some unidentified point."  *Id*. at 557.  Nor can it be met by merely pleading "parallel conduct or interdependence," which, without more, may be "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  *Id*. at 554.

In the decade following *Twombly,* both the Ninth Circuit and this Court have had multiple occasions to apply the *Twombly* standard, and it is now well-recognized that an antitrust complaint "must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." *Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042, 1047 (9th Cir. 2008) (citing *Twombly*, 550 U.S. at 565 n.10). Alleging a mere *opportunity* to collude, such as through attendance at trade association meetings or similar events, is insufficient. *Id.* at 1048; *see also Twombly*, 550 U.S. at 567 n.12; *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015); *B & R Supermarket, Inc. v. Visa, Inc.*, 2016 WL 5725010 (N.D. Cal. Sept. 30, 2016); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007).

Plaintiff's complaint falls far short of these requirements. Not only does she fail to allege any specific facts that, if proven, would establish the existence of a conspiracy, but the few facts she does allege are *incompatible* with the "agreement" that she claims. Whereas the *Twombly* plaintiffs failed to "nudge[] their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, plaintiff's conclusory allegation of conspiracy does not even come close to that line. Accordingly, her complaint should be dismissed.

## II.    ALLEGATIONS OF THE COMPLAINT

Plaintiff is a "trained well-rounded and multi-disciplinary dancer who spent nearly two decades training to be a ballet dancer." Complaint ¶ 7. She was a cheerleader for the San Francisco 49ers from either May 2013 (*id.* ¶ 58) or July 2013 (*id.* ¶ 7) through early 2014. *Id.* She seeks to represent a class of all persons who were employed by defendants as cheerleaders within four years of the filing of the complaint. *Id.* ¶ 45.

Plaintiff asserts two claims against the NFL and 26 individual NFL clubs for alleged violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720, and Section 1 of the Sherman Act, 15 U.S.C. § 1. Both claims rely on the same core assertion: that defendants entered into a conspiracy to suppress the compensation of cheerleaders. Plaintiff's "Factual Allegations" (found in paragraphs 55-99 of the complaint) assert over and over, in conclusory terms and on "information and belief," that defendants "conspired" to fix cheerleader compensation. *See, e.g.,* Complaint ¶¶ 74 ("on information and belief,

Defendants conspired to ensure this competition did not occur for its female athletes, thus resulting in artificially low compensation"); 76 ("On information and belief, Plaintiff alleges Defendant NFL Member Teams actively conspired to suppress female athlete earnings"); 80 ("Each Defendant NFL Member Team, through its senior executives as alleged herein, agreed to . . . [s]uppress earnings for female athletes well below their fair market value"); 81 ("On information and belief, Defendant NFL conspired with the Defendant NFL Member Teams to coordinate, encourage, facilitate, and implement the agreement to pay female athletes below fair market value."); 84 ("On information and belief, in doing so, Defendant NFL conspired with Defendant NFL Member Teams to suppress market competition among female athletes and ensure female athlete earnings remained far below fair market value."); 98 ("[O]n information and belief, Defendant NFL Member Teams conspired to keep female athlete compensation low"); *see also id.* ¶¶ 1-5 (offering similar allegations).

Notwithstanding this repeated conclusory refrain, the absence of *factual* allegations concerning this alleged conspiracy is striking. For example, plaintiff "is unaware of precisely when this conspiracy was first consummated." *Id.* ¶ 86. Nor does she identify who entered into the alleged agreement, the specific content of the alleged agreement (e.g., what wages were supposedly agreed upon), how or where the agreement was consummated, how the agreement was communicated among the NFL and 26 member clubs, or how it was enforced. Instead, plaintiff speculates that unidentified "senior executives" could have entered into such an agreement at any number of events, including "NFL owner meetings, the NFL scouting combine, the NFL Draft, the Super Bowl, the Pro Bowl, trade shows, and even conference calls among senior executives, among other events." Complaint ¶ 79. The complaint identifies no particular meeting, College Draft, game, trade show or conference call where the supposed conspiracy was even discussed, let alone agreed upon and implemented.

The only concrete *fact* alleged by plaintiff that relates to her conspiracy allegation is a provision of the NFL Constitution & Bylaws that requires NFL member clubs to provide to the League Office copies of their employee contracts. *Id.* ¶ 81. Plaintiff speculates that the NFL could have somehow used this requirement to "enforce[]" an agreement with respect to cheerleader wages. *Id.* ¶ 82.

However, she alleges no act by the NFL (or anyone else) in furtherance of any such agreement or any such "enforcement."[1] Moreover, although plaintiff alleges, repeatedly, that the club defendants agreed on common cheerleader wages, the only *facts* she alleges concerning the wages and other employment terms offered by defendants indicate precisely the opposite – namely, that those terms varied considerably. *See id.* ¶ 87. Such variance is, of course, antithetical to the notion of a conspiracy.

## III. ARGUMENT

To plead a claim under Section 1 of the Sherman Act, a plaintiff must allege "evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall*, 518 F.3d at 1047 (citations omitted). The requirements to plead a claim under the Cartwright Act – which was patterned after Section 1 of the Sherman Act – are largely the same. *B & R Supermarket,* 2016 WL 5725010, at *12 (citing *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1476-77 (9th Cir. 1986)).

In addressing a motion to dismiss, the Court must generally take all material allegations as true and construe them in the light most favorable to the plaintiff, but "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Ove v. Gwinn*, 264 F.3d 817, 821 (9th Cir. 2001); *In re Graphics Processing Units*, 527 F. Supp. 2d at 1018. Moreover, allegations offered "on information and belief" need not be considered unless: (1) "the facts are peculiarly within the possession and control of the defendant," and/or (2) "the belief is based on factual information that

---

[1] Paragraph 83 of the complaint asserts that "the NFL Constitution and Bylaws regulate specific terms and conditions which must be present in all employment contracts between NFL member teams and their non-player employees, including female athletes," but does *not* allege that those "terms and conditions" relate in any way to the compensation paid to cheerleaders. Plaintiff also alleges in conclusory terms that the "NFL Member Teams agreed to and did use fear and intimidation to induce compliance and acceptance of suppressed earnings by female athletes." Complaint ¶ 98. Yet not a single instance of such "fear and intimidation" is described; nor is a single perpetrator or victim of such "intimidation" identified. Nor does the complaint offer any other factual allegations to support this conclusory assertion.

makes the inference of culpability plausible." *Park v. Thompson*, 2017 WL 971806, at *12 (9th Cir. Mar. 14, 2017) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)); *see also Blantz v. California Dep't of Corr. & Rehab.*, 727 F.3d 917, 927-28 (9th Cir. 2013) (dismissing claims where only allegations that mentioned defendant were "on information and belief" and "[c]onclusory allegations such as these are insufficient to state a claim").

### A. Plaintiff's Conspiracy Allegations Fail to Satisfy the *Twombly* Standard.

Although the complaint refers repeatedly to a "conspiracy" or "agreement" among the defendants, such conclusory allegations lack the required degree of specificity to state a claim. *See Twombly*, 550 U.S. at 557 ("a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"). To survive a motion to dismiss, a conspiracy claim must identify the specific circumstances of the alleged agreement, such as a "specific time, place, or person involved in the alleged conspiracies." *Twombly*, 550 U.S. at 565 n.10. In other words, it should answer at least the "basic questions" of "who, did what, to whom (or with whom), where, and when?" *Kendall*, 518 F.3d at 1048. Plaintiff has failed to satisfy these requirements.

### 1. The Complaint Pleads No Facts Relating to the Alleged Conspiracy.

Plaintiff's complaint does not even begin to answer the "basic questions" of "who, did what, to whom (or with whom), where, and when?" *Kendall*, 518 F.3d at 1048. Plaintiff fails to plead any specific facts identifying *where* or *how* the alleged agreement was made. She identifies various occasions when "senior executives" of defendants "collectively gather," including "annual NFL owner meetings, the NFL scouting combine, the NFL Draft, the Super Bowl, the Pro Bowl, trade shows, and even conference calls among senior executives, among other events." Complaint ¶ 79. But although she alleges in conclusory terms that "agreements were made" on such occasions, this allegation is pure speculation; she offers no *facts* that, if proved, would establish that any agreement about cheerleader compensation was reached on any such occasion – or even that the individuals who gathered at the occasions she describes had a role in determining cheerleader compensation. As the Ninth Circuit and this Court have both observed, "mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." *In re Musical*

*Instruments*, 798 F.3d at 1196; *see also B & R Supermarket*, 2016 WL 5725010, at *8; *In re Graphics Processing Units*, 527 F. Supp. 2d at 1023 ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more.") (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999)).

For example, in *In re Graphics Processing Units*, this Court dismissed a complaint alleging that makers of graphics processing units conspired to fix prices and coordinate releases of new products. 527 F.Supp. 2d at 1024. The *GPU* plaintiffs alleged that a conspiracy could be inferred from defendants' attendance at various industry-wide meetings, such as trade shows. *Id*. Indeed, going beyond plaintiff's allegations here, the *GPU* plaintiffs attempted to "correlate the trade shows to the release of products at certain price points, implying that defendants must have met and made the decisions to do so." *Id.* at 1023. But even those allegations were held insufficient to plead a conspiracy.

There can be no serious question that "senior executives" of NFL clubs have legitimate business reasons for attending the Super Bowl, annual meetings, and other events relating to the NFL's business. Mere attendance at such events cannot come close to establishing that any unlawful agreement relating to cheerleader wages was entered into on any of those occasions. Plaintiff offers no factual allegations indicating that cheerleaders – much less cheerleader compensation – were even *discussed* during any of these events.

The complaint is also deficient in failing to identify *who* entered into the alleged agreement on behalf of each defendant, and when and how those individuals did so. *See Kendall*, 518 F.3d at 1048. The complaint alleges that a wide range of individuals *could have been* involved, including "Defendant NFL Member Team owners, high ranking management officials, and heads of each Defendant Member Team's 'cheerleading' team." Complaint ¶ 79. But this speculative allegation falls far short of the requirement to identify a "specific . . . person involved in the alleged conspiracies." *Twombly*, 550 U.S. at 565 n.10. And plaintiff concedes that she does not know when the alleged agreement was formed. Complaint ¶¶ 5, 86.

In short, plaintiff alleges no actual facts suggesting the existence of any conspiracy. She simply alleges, in conclusory fashion, that a conspiracy exists. That is not enough to survive a motion to dismiss under the *Twombly* standard.

2. **Plaintiff's Allegation that the NFL Received Copies of Cheerleader Contracts Cannot Establish a Conspiracy to Fix the Compensation of Cheerleaders.**

Plaintiff alleges in conclusory terms (on "information and belief") that the NFL "enforced" the alleged conspiracy by requiring clubs to submit copies of their employee contracts to the NFL under its Constitution and Bylaws. Complaint ¶¶ 81-84.[2] This allegation rests upon an unsupported leap of logic. The only fact alleged is that the clubs were required to file employee contracts with the NFL. That is not evidence of any conspiracy; nor does it support a conclusion about "enforcement" of any conspiracy. A requirement to submit employment contracts does not even address – much less carry with it a requirement concerning – compensation terms to be included in those contracts. And the complaint alleges no facts to support the conclusory allegation that the NFL somehow used these contracts to "enforce" the alleged conspiracy. Indeed, the complaint does not even suggest in hypothetical terms how such enforcement would have occurred. This bare allegation is insufficient to state a claim, either against the NFL or against any other defendant.

3. **Plaintiff Has Not Alleged a Plausible Basis for Inferring a Conspiracy Based on Parallel Conduct.**

Having failed to plead any facts that would directly establish a plausible agreement under the *Twombly* standard, plaintiff appears to rely on circumstantial allegations to suggest that a conspiracy may be inferred because, plaintiff says, defendants acted in parallel. A conspiracy claim based on parallel conduct must allege both (i) actual parallel conduct and (ii) additional "plus factors" that represent "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated conduct." *In re Musical Instruments*, 798 F.3d at 1194. As this Court has recently recognized, such "plus factors" could include a post-conspiracy departure from a preexisting pattern of conduct, or an absence of competitive behavior in a situation where each

---

[2] Although plaintiff does not attach the relevant provision (Section 9.3(A)(2)) of the NFL's Constitution and Bylaws to the Complaint, the document is publicly available. *See* Constitution and Bylaws of the National Football League 42 (2006), http://static.nfl.com/static/content/public/static/html/careers/pdf/co_.pdf. The provision is not (and is not alleged to be) specific to cheerleaders; rather, it refers generally to "non-player employee[s]."

individual co-conspirator would have benefitted from breaking ranks.  *See B & R Supermarket*, 2016 WL 5725010, at *8.

Neither parallel conduct nor plus factors have been alleged here.

### a)  Plaintiff Has Not Pled Parallel Conduct.

As a threshold matter, the complaint fails even to plead facts suggesting parallel conduct.

Plaintiff alleges in conclusory terms that defendants conspired to pay cheerleaders a "low, flat wage" for each game.  Complaint ¶ 2.  But the only facts alleged in the complaint about cheerleader wages reveal that the compensation defendants paid to cheerleaders varied considerably.

According to the complaint, the Bills did not pay their cheerleaders at all for appearances at games.  Complaint ¶ 87.  The Raiders, on the other hand, allegedly paid cheerleaders $125 for each game.  *Id*.  The Buccaneers are alleged to have paid $100 per game, and the Bengals are alleged to have paid $90.  *Id*.  Plaintiff offers no allegations about what the other club defendants pay their cheerleaders – she does not even state what her own compensation was as a 49ers cheerleader.  But the variation in the figures she does provide are inconsistent with any plausible conclusion of parallel conduct, much less an agreement.  Courts have found much smaller differences to undermine allegations of parallel conduct.  *See*, e.g., *In re Graphic Processing Units*, 527 F. Supp. 2d at 1022 (finding that a $20 difference in price "fall[s] short of unusual, lockstep pricing behavior.").

Plaintiff also alleges that defendants entered into a conspiracy not to pay cheerleaders for time spent at required activities other than games, such as rehearsals and community outreach.  Complaint ¶ 2.  But elsewhere in the complaint, plaintiff asserts that some clubs did, in fact, pay their cheerleaders for at least some non-game activities, alleging only that they did so "rarely."  Complaint ¶ 87.  And, once again, plaintiff is strikingly silent about whether *she* was paid for non-game events and is similarly silent about the practices of the majority of other club defendants.  *Id*.  This again falls well short of establishing that defendants actually proceeded in parallel.

All of plaintiff's other allegations of parallel behavior are completely conclusory.  Plaintiff alleges, for example, that defendants "agreed" to prohibit cheerleaders from discussing their earnings with each other (Complaint ¶ 2) but cites no *facts* alleging that even one, much less all, defendants actually did so.

Insofar as plaintiff seeks to plead a conspiracy based on inferences drawn from parallel conduct, her allegations fail at the threshold.

### b) Plaintiff Fails to Plead Any Plus Factors.

Absent adequate allegations of parallel conduct, the Court need not even consider whether sufficient "plus factors" have been alleged. In any event, plaintiff has failed to plead the necessary "plus factors . . . largely inconsistent with unilateral conduct" that would allow such parallel behavior to support an inference of conspiracy. *In re Musical Instruments*, 798 F.3d at 1194; *see also Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*, 795 F.3d 1124, 1130 (9th Cir. 2015) (dismissing claims that ICANN's application process for domain names was anticompetitive, because court could not "infer an anticompetitive agreement when factual allegations 'just as easily suggest rational, legal business behavior'") (citing *Kendall*, 518 F.3d at 1049). For example, there is no allegation that *changes* in the wages paid to defendants' cheerleader employees occurred at the same time or in a manner suggestive of coordination. *See*, *e.g.*, *B & R Supermarket*, 2016 WL 5725010, at * 7.

Most of plaintiff's allegations that arguably relate to potential "plus factors" consist of bare conclusions, unsupported by specific facts, even where such facts ought to be within her personal knowledge. For example, as discussed above, although plaintiff alleges in conclusory terms that defendants agreed to prohibit cheerleaders from discussing their earnings with each other (Complaint ¶ 2), she does not allege that she herself was prohibited from discussing her earnings with others, much less that any such policy was established and communicated by every defendant. If this allegation was intended to identify a "plus factor" suggesting an inference of conspiracy, it falls far short of the mark.

The same defects undermine plaintiff's conclusory allegation that defendants agreed to refrain from recruiting cheerleaders from other NFL clubs. *See* Complaint ¶¶ 2, 76, 78. Again, no specific facts are alleged to support this assertion, which is undermined by other allegations of the complaint. For example, plaintiff suggests, not unreasonably, that a 49ers cheerleader would be unlikely to pursue a position with the Cowboys' cheerleading squad because the cost of traveling to Dallas to try out and subsequent costs of relocating to Dallas would be prohibitive. Complaint ¶ 99. Thus, insofar as plaintiff intends to suggest that cheerleaders rarely move from one NFL team to another (a suggestion for which

she offers no concrete allegations of fact), her complaint offers the most likely explanation.  No

"agreement" is needed to achieve an outcome that is already dictated by common sense.[3]

Plaintiff's allegations about the disparity between wages paid to cheerleaders and those paid to

players and other club employees do nothing to support her allegation of conspiracy.  She alleges no

facts that, if proven, would establish that the gap between the compensation paid to professional football

players and compensation paid to cheerleaders is different from what one would expect in a freely

competitive marketplace.  The NFL clubs that choose to employ cheerleaders (and not all do) view them

as an enhancement of the game experience.  But plaintiff does not, and could not, reasonably dispute

that it is the football game and the football players on the field that fans primarily come to see.

Perhaps most fundamentally, plaintiff's allegations simply fail to establish a plausible theory of

injury to competition.  Plaintiff's complaint refers to other litigation filed against individual NFL clubs

relating to their compliance with employment laws.  But this is an *antitrust* case, and the focus of the

antitrust laws is on *injury to competition.  Kendall*, 518 F.3d at 1047 (plaintiffs must allege conspiracy

"which actually injures competition").  Plaintiff has offered no concrete allegations that, if proven,

would establish that defendants have attempted to cause any injury to competition, much less that they

have succeeded in doing so.

On this point, like so many others, plaintiff's allegations are either entirely conclusory or actually

*undermine* her claim.  Plaintiff alleges that cheerleaders' pay has been far below fair market value,

which, she says, unidentified "industry experts" place at $100,000 per cheerleader per year.  Complaint

¶¶ 92, 97.  But plaintiff does not explain how these purported "industry experts" arrived at this figure;

nor does she identify any facts on which it is based – and whether, for example, it takes into account the

---

[3] Insofar as plaintiff intends by this allegation to suggest that defendants have suppressed cheerleader salaries *for the purpose of* limiting cheerleader mobility, such a theory is simply not plausible.  Plaintiff offers no rational explanation for why NFL clubs would be so concerned about keeping their existing cheerleaders in place that they would suppress those employees' wages for the purpose of making it harder for them to leave.  Moreover, as discussed below, the allegations of the complaint suggest that cheerleaders have significant alternative employment options available close to home, making any such theory even more implausible.

part-time, largely seasonal nature of these positions. Indeed, other allegations of the Complaint are inconsistent with the "industry expert" figure; for example, the Complaint uses rates recommended by Dancers Alliance, a union for dancers and choreographers, to estimate that cheerleaders should have been paid $26,000 a year. Complaint ¶ 94.

More significantly, if one credits the complaint's allegations about rates paid for allegedly comparable work, there is a wide range of substitute employment options for cheerleaders – options that are completely independent of, and therefore unaffected by, the alleged conspiracy to suppress NFL cheerleader wages. According to the complaint, plaintiff is a "trained well-rounded and multi-disciplinary dancer who spent nearly two decades training to be a ballet dancer." Complaint ¶ 7. With these qualifications, the complaint suggests that plaintiff could have found alternate work dancing for "Live Shows, Industrials & Non-Union Music Videos" under the Dancers Alliance rates, *id.* ¶ 93, or she could have received compensation for use of her likeness as a member of the Screen Actors Guild-American Federation of Television and Radio Artists. Complaint ¶ 96. With such ready alternatives available for the same labor pool from which cheerleaders are drawn, it is simply not plausible to conclude that defendants – who in most cases operated hundreds or even thousands of miles away from one another – could have implemented a successful conspiracy to maintain cheerleader wages at below-market rates. *See, e.g., Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *5 (N.D. Cal. Jan. 9, 2012), *aff'd*, 563 F. App'x 571, 572 (9th Cir. 2014) (Plaintiff "failed to plead sufficient facts to present a plausible claim that there was . . . the potential for significant anti-competitive effects . . . . Hence, the claimed conspiracy would have made no economic sense.").

**B.** **Plaintiff's Cartwright Claim Fails Under Settled California Law.**

The same flaws that defeat plaintiff's Sherman Act claim also infect her Cartwright Act claim, which should accordingly be dismissed for the reasons set out above. *See In re Graphics Processing Units*, 527 F. Supp. 2d at 1025 (dismissing Cartwright Act claim predicated on same allegations of conspiracy as Sherman Act claim, explaining that "[f]ederal pleading standards govern in federal court, even as to state claims").

Plaintiff's Cartwright Act claim also should be dismissed for the separate reason that the Cartwright Act does not apply to the alleged conduct addressed in the complaint. Although for most

purposes the Cartwright Act is interpreted as having a scope similar to the Sherman Act, the California courts have identified exceptions to this parallel interpretation; those exceptions govern the application of the Cartwright Act in this Court. *Dimidowich*, 803 F.2d at 1476-77; *see generally Wainwright v. Goode*, 464 U.S. 78, 84 (1983) ("the views of the state's highest court with respect to state law are binding on the federal courts").

One such exception relates to the application of the Cartwright Act to professional football. Three decades ago, the California Supreme Court explicitly and unambiguously held that "the Cartwright Act is not applicable to the interstate activities of professional football." *Partee v. San Diego Chargers Football Co.*, 34 Cal. 3d 378, 380 (1983); *see also Hebert v. Los Angeles Raiders, Ltd.*, 23 Cal. App. 4th 414, 422-25 (1994) (observing that the court in *Partee* "reached its conclusion as a matter of law"). *Partee*, like this case, involved an antitrust challenge to the wages paid to NFL club employees (in that case professional football players). 34 Cal. 3d 378, 380. The California Supreme Court concluded that such a challenge could not be pursued under the Cartwright Act, and plaintiff's claims cannot be distinguished from the claims barred in that decision. *Id.*

*Partee* was based on the California Supreme Court's determination that the Cartwright Act should not be interpreted as applying to the interstate activities of professional sports leagues, including those of the NFL. *Id.* at 385. That holding reflects the state court's conclusion, as the Ninth Circuit has recognized, that national sports leagues are "unique" and thus not appropriately subject to separate state-by-state antitrust regulation. *Valley Bank of Nevada v. Plus Sys., Inc.*, 914 F.2d 1186, 1192 & n.12 (9th Cir. 1990) (recognizing the holding of *Partee* that "state antitrust laws [are] inapplicable to [the] national football league").

*Partee* has been repeatedly followed by California and federal courts to prohibit Cartwright Act challenges to alleged restraints of trade by professional sports leagues. *See, e.g.*, *City of San Jose v. Office of the Comm'r of Baseball*, 2013 WL 5609346, at *13 (N.D. Cal. Oct. 11, 2013) (applying *Partee* to Cartwright Act challenge to Major League Baseball club relocation policy), *aff'd*, 776 F.3d 686 (9th Cir. 2015); *see also Hebert*, 23 Cal. App. 4th at 423 (finding that *Partee* required dismissal of complaint

challenging NFL rules); *City of Oakland v. Oakland Raiders*, 174 Cal. App. 3d 414, 420 (1985) (relying on *Partee* to reject city's exercise of eminent domain over NFL club).[4]

Except for specifically recognized exceptions, the commercial activities of the NFL and its member clubs are subject to *federal* antitrust laws. *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010). However, the California Supreme Court has conclusively determined that state antitrust law does not apply to NFL operations.

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' complaint should be dismissed.

DATED:  April 4, 2017                                    Respectfully submitted,

                                                         COVINGTON & BURLING LLP


                                                         By:  ___/s/ Sonya D. Winner___
                                                              Sonya D. Winner

                                                         Sonya D. Winner (Bar No. 200348)
                                                         swinner@cov.com
                                                         Joanne Sum-Ping (Bar No. 296552)
                                                         jsumping@cov.com
                                                         COVINGTON & BURLING LLP
                                                         One Front Street, 35th Floor
                                                         San Francisco, California 94111-5356
                                                         Telephone:  (415) 591-6000
                                                         Facsimile:  (415) 591-6091

                                                         Derek Ludwin (*pro hac vice pending*)
                                                         dludwin@cov.com

---

[4] In *Dang v. San Francisco Forty Niners, Ltd.*, 2014 WL 4275627 (N.D. Cal. Aug. 29, 2014), a case involving the collective licensing of club trademarks and logos for apparel, the district court declined to apply *Partee* at the Rule 12 stage, without prejudice to renewal on a more developed factual record. The decision rested on the court's conclusion that "the licensing activities [in that case] are qualitatively different from the labor contracts discussed in *Partee*." *Id.* at *3. There is no question that plaintiff's claims in this case are of the kind covered by *Partee*; like the plaintiffs in *Partee*, plaintiff complains of an alleged interstate conspiracy to suppress wages.

COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone:  (202) 662-5429
Facsimile:  (202) 778-5429

Attorneys for Defendants

Kenneth G. Hausman (Bar No. 57252)
kenneth.hausman@apks.com
David J. Reis (Bar No. 155782)
david.reis@apks.com
ARNOLD & PORTER KAYE SCHOLER
LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400

Attorneys for Defendant The Oakland Raiders