IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KELSEY K., individually and on behalf of all others similarly situated,

    Plaintiff,

v.

NFL ENTERPRISES, LLC, *et al.*,

    Defendants.

No. C 17-00496 WHA

**ORDER GRANTING MOTION TO DISMISS AND DENYING REQUEST FOR DISCOVERY**

**INTRODUCTION**

In this putative class action for antitrust violations, defendants move to dismiss. The motion is **GRANTED**. Plaintiff's request for discovery at the pleading stage is **DENIED**.

**STATEMENT**

Plaintiff Kelsey K. asserts putative class claims for violations of the Sherman Act and the Cartwright Act against the National Football League and 27 of its member teams. The gravamen of the complaint is that defendants conspired "to fix and suppress the compensation of" and "to eliminate competition among them for" cheerleaders. The following facts are taken from the well-pled allegations of the complaint (Dkt. No. 1).

In recent decades, NFL revenue and profits have skyrocketed, and the salaries of male athletes have followed suit (*id.* ¶¶ 60–63). As of 2016, NFL players earned an average of approximately $1.3 million per athlete, practice squad players earned at least $117,300 per season, and mascots earned anywhere from $25,000 to $65,000 per year (plus benefits). In

contrast, cheerleaders — who perform during televised games and participate in community outreach and photo shoots — still earn "well below market value" (*id.* ¶¶ 63, 68–71). During the relevant time period, no NFL team ever attempted to recruit a cheerleader from another team, even when located in the same geographic market (*id.* ¶ 77).

Senior executives in the NFL — including team owners, high-ranking management officials, and the heads of cheerleading teams — gather at "various meetings throughout the year." Such meetings include "annual NFL owner meetings, the NFL scouting combine, the NFL Draft, the Super Bowl, the Pro Bowl, trade shows, and even conference calls among senior executives" (*id.* ¶ 79). Additionally, the NFL constitution and bylaws require all teams to "file with the NFL all written employment contracts with all non-player employees" (*id.* ¶¶ 81, 83). This filing occurs each year as teams hire new waves of cheerleaders (*id.* ¶ 86).

The complaint asserts that, through the foregoing means, the NFL and its member teams conspired to suppress earnings for cheerleaders below fair market value by (1) paying them "a low, flat wage for each game" and not paying them for rehearsals or community outreach events; (2) refraining from poaching other teams' cheerleaders; and (3) prohibiting cheerleaders from seeking employment with other professional cheerleading teams and from discussing their earnings with each other (*e.g.*, *id.* ¶ 80).

The complaint also alleges that NFL teams conspired to "use fear and intimidation to induce compliance [with] and acceptance of suppressed earnings." For example, unspecified NFL teams and agents allegedly told unidentified cheerleaders "they were lucky to be chosen, should be grateful and could be quickly replaced if they failed to perform in any way" (*id.* ¶ 98). The suppression of earnings also had the effect of suppressing cheerleader mobility, since the costs of moving to or even auditioning for a different team in a different geographic region, relative to the expected profits from such a move, would be prohibitively high. The lack of mobility, in turn, "reinforced the suppression of earnings" for cheerleaders (*id.* ¶ 99).

The complaint alleges some effects said to flow from the purported conspiracy. At unspecified times in the past, the Raiders paid their cheerleaders a flat fee of $125 per game and did not pay them for rehearsals or "mandatory community events, along with other time that

should have been compensated." The Buccaneers paid their cheerleaders a flat fee of $100 per game, did not pay them for rehearsals, and "rarely paid a low hourly wage for community events." The Bengals paid their cheerleaders a flat fee of $90 per game and did not pay them for rehearsals or community events. The Bills did not pay their cheerleaders at all for games or rehearsals "and rarely paid them for community events" (*id.* ¶ 87).

After "a rash of lawsuits filed over the last few years alleging that various NFL teams paid their [cheerleaders] below the legally-mandated minimum wage," however, NFL teams "generally raised their earnings for [cheerleaders] to minimum wage" (*id.* ¶¶ 75, 89). The complaint is silent on the current state of cheerleader compensation in the NFL but alleges, on "information and belief," that the true fair market value for cheerleaders "may have been and may continue to be" approximately $100,000 per cheerleader per year "based on consultations with industry experts" (*id.* ¶ 92).

Based on the foregoing allegations, plaintiff asserts claims for violations of the Sherman Act and the Cartwright Act. Defendants move to dismiss. This order follows full briefing and oral argument.

**ANALYSIS**

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when its factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party, conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss. *Ove v. Gwinn*, 264 F.3d 817, 821 (9th Cir. 2001). For example, "formulaic recitation of the elements" of a claim are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 681. A plaintiff may, however, plead facts "alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928–29 (9th Cir. 2017).

3

To be clear, the complaint here asserts *only* claims for violations of antitrust law. This is *not* a lawsuit for violation of wage-and-hour or labor laws (*see, e.g.*, Dkt. No. 1 ¶ 75). Nor is it a complaint for general maltreatment of cheerleaders. For present purposes, allegations that cheerleaders deserve to be paid more for their skills (*see, e.g.*, *id.* ¶ 67), or that defendants treated cheerleaders in "insulting" or "demeaning" ways (*see, e.g.*, *id.* ¶¶ 63, 66, 88), even if true, are inapposite. Plaintiff chose to assert *antitrust* claims, so she must plead factual allegations sufficient to show violations of *antitrust* law.

To state an antitrust claim here, plaintiff must plead not only "ultimate facts, such as conspiracy, and legal conclusions" — *e.g.*, that defendants agreed not to compete with each other or entered into an agreement to prevent competition — but also "the necessary evidentiary facts to support those conclusions." Put differently, the complaint must answer the basic questions of "who, did what, to whom (or with whom), where, and when?" *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047–48 (9th Cir. 2008). Plaintiff has not met these requirements.

### 1. SHERMAN ACT CLAIM.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. 1. A Section 1 claim requires (1) a contract, combination, or conspiracy (2) intended to unreasonably restrain or harm trade (3) that actually injures competition and (4) harms the plaintiff via the anticompetitive conduct. *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1129 (9th Cir. 2015); *see also Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (citing *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189–90 (2010)).

For a conspiracy of the scale alleged by this complaint, one would expect at least some evidentiary facts to have been located and pled. For example, a former NFL employee might have come forward to counsel, at least as a confidential witness, to provide the details of "who, did what, to whom (or with whom), where, and when" regarding some actual conspiratorial meeting, communication, or agreement. The complaint fails to allege anything of the sort and instead rests on assertions of parallel conduct anchored in rhetoric and conclusory statements.

4

### A. No Allegations of Parallel Conduct with Plus Factors.

To state a claim under Section 1, the complaint must contain sufficient factual matter, taken as true, to suggest that an agreement was made. Mere allegations of parallel conduct that "could just as well be independent action" and bare assertions of conspiracy do not suffice. *Twombly*, 550 U.S. at 556–57. In our circuit, courts distinguish permissible parallel conduct from impermissible conspiracy by looking for "plus factors," *i.e.*, "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193–94 (9th Cir. 2015). Put differently, because plaintiff relies solely on circumstantial evidence of conspiracy, she must allege facts tending to exclude the possibility that defendants acted independently. *See In re Citric Acid Litig.*, 191 F.3d 1090, 1096 (9th Cir. 1999).

Applying the foregoing standards here, this order concludes that the complaint fails to state a plausible claim under Section 1 of the Sherman Act.

#### (1) Attendance at Annual Events.

The complaint alleges that senior executives in the NFL gathered at "various meetings" throughout the year, including "annual NFL owner meetings, the NFL scouting combine, the NFL Draft, the Super Bowl, the Pro Bowl, trade shows, and even conference calls" (Dkt. No. 1 ¶ 79). But this allegation, taken as true, supports no inference of nefarious purpose or unlawful conduct. Attendance at the aforementioned annual events would have been consistent with simply running the business of the NFL and its member teams, a perfectly legitimate endeavor.

In *Citric Acid*, our court of appeals refused to infer conspiracy from the mere fact that trade associations gathered information about pricing and competition because such activities constituted "standard fare" and served "legitimate functions" in the industry. 191 F.3d at 1098. Similarly, this order declines to infer conspiracy from the mere fact that defendants attended annual events that constitute standard fare and serve legitimate functions in the NFL. Plaintiff attempts to distinguish *Citric Acid* on the basis that it considered a motion for summary judgment rather than a motion to dismiss but fails to explain how this affects the relevant

5

principle. The complaint's allegations here, taken as true, are analogous to the evidence in *Citric Acid*. Both fail to support any plausible inference of conspiracy.

Both sides cite two previous decisions by the undersigned judge to guide the analysis here. One dismissed an antitrust claim that pled "at most that defendants had the opportunity to [meet and agree to fix prices] because they attended many of the same meetings," and "then attempt[ed] to correlate the release of products with those meetings." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007). The other declined to dismiss an antitrust complaint that alleged more than "mere participation in trade-organization meetings." *B & R Supermarket, Inc. v. Visa, Inc.*, No. C 16-01150 WHA, 2016 WL 5725010, at *8 (N.D. Cal. Sept. 30, 2016).

Significantly, in *B & R* the operative complaint alleged *direct* evidence of a conspiracy via certain admissions from the defendants. That operative complaint also alleged (1) that in implementing the alleged conspiracy, the defendants departed from their preexisting pattern of conduct; (2) a "clear common motive to conspire" between defendants; (3) that the defendants exhibited an "absence of competitive behavior" despite having specific incentive to compete; and (4) that specific employees of each defendant attended a conference featuring panels with descriptive titles that seemed consistent with the alleged conspiracy. These "plus factors," considered as a whole and together with direct evidence of conspiracy, sufficed to raise a plausible suggestion of collusion rather than mere parallel conduct. *Id.* at *6–9.

Plaintiff argues that *Graphics Processing Units* is distinguishable because the complaint here "is not pleading mere opportunity" to conspire and that, like the complaint in *B & R*, the complaint here pleads "*specific* meetings where *specific* (though unnamed) *persons* expressly agreed to engage in very specific activities in an effort to collectively suppress wages of a specific set of their respective employees" (Dkt. No. 21 at 12). This order disagrees.

Unlike the complaint in *B & R*, the complaint here shows no *direct* evidence of conspiracy, no departure from any preexisting pattern of conduct (nor could it, since plaintiff describes the conspiracy as a continuing phenomenon with no specific beginning (Dkt. No. 1 ¶ 86)), no "clear common motive to conspire" between defendants, and no unusual "absence of

6

competitive behavior." The complaint alleges a broad range of routine annual events in the NFL but fails to allege that any *specific* meeting set the stage for conspiracy, much less factual details — like the conference panel titles in *B & R* — tending to support the inference of unlawful conduct therein. In short, the complaint here simply does not allege the type of direct and circumstantial evidence that, taken as a whole, sufficed to state a claim for relief in *B & R*.

Plaintiff contends the complaint "specifically alleges more than joint participation; it alleges Defendants entered into an express agreement or series of agreements to eliminate competition among them" (Dkt. No. 21 at 12). The three paragraphs of the complaint that plaintiff cites in support of the foregoing, however, contain only allegations of parallel conduct and conclusory allegations of conspiracy (*see* Dkt. No. 1 ¶¶ 1–2, 79). As explained, parallel conduct alone does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. *Graphics Processing Units*, 527 F. Supp. 2d at 1024 (quoting *Twombly*, 550 U.S. at 556–57).

Plaintiff also points out that the complaint alleges "the NFL exercises significant control over the individual teams" by requiring them to file cheerleader contracts with the NFL (Dkt. No. 21 at 13). But plaintiff does not suggest that either the NFL's control over its member teams or its contract-filing requirement strays from the NFL's legitimate operations. For all the complaint shows, the filing requirement might actually have been intended to protect employees. Plaintiff simply describes these operations as an "enforcement mechanism" for conspiracy — just as she describes legitimate NFL meetings and events as opportunities to conspire. Both descriptions are rhetorical spin that beg the most important question, namely, whether there was any conspiracy to begin with. On that key question, the complaint lacks the factual allegations demanded by *Twombly*.

### *(2) Payment of Low, Flat Wages.*

The complaint alleges specific facts concerning cheerleader wages only as to the Raiders, Buccaneers, Bengals, and Bills (but not as to plaintiff's own former employer, the 49ers). Even among those four examples, however, the conduct alleged is hardly parallel. According to the complaint, the Raiders paid their cheerleaders a flat fee of $125 per game, the

Buccaneers paid their cheerleaders a flat fee of $100 per game, the Bengals paid their cheerleaders a flat fee of $90 per game, and the Bills did not pay their cheerleaders for games at all. And while the Raiders and the Bengals did not pay their cheerleaders for community events, the Buccaneers and the Bills sometimes did (Dkt. No. 1 ¶ 87). These admissions of non-parallel conduct undercut the very theory asserted by the complaint. Plaintiff's attempts to gloss over the differences in conduct between defendants are unavailing.

*First*, plaintiff claims "the difference in ranges of compensation is *de minimis*," and that the difference between the pay of a Raiders cheerleader and that of a Buccaneers cheerleader is "0.8 percent" (Dkt. No. 21 at 13). This turns out to be counterfeit logic. According to the complaint itself, the difference is between $125 per game and $100 per game — actually 20 or 25 percent. To take an even stronger example, according to the complaint, the Raiders paid their cheerleaders $125 per game while the Bills paid their cheerleaders *zero* dollars per game. These differences make plaintiff's theory implausible. *See Graphics Processing Units*, 527 F. Supp. 2d at 1022 (finding allegations of parallel conduct less convincing where defendants accused of price fixing released products with a difference in price of just twenty dollars).

*Second*, plaintiff argues that these differences are "inconsequential" when considered against what the complaint claims cheerleaders *should* have been paid, *i.e.*, $26,000 to $100,000 per year, because her theory is not that defendants "agreed to pay the same" but that they "agreed to pay illegally, and to keep wages down" (Dkt. No. 21 at 14). Even construing plaintiff's theory this way, however, fails to resolve all inconsistencies between the theory and the complaint's own allegations. For example, the complaint asserts that defendants conspired to pay cheerleaders a low, flat wage per game. This is inconsistent with its allegation that the Bills paid their cheerleaders *nothing* for games. The complaint also asserts that defendants conspired to not pay cheerleaders for community events. This is inconsistent with its allegation that the Buccaneers and the Bills sometimes paid their cheerleaders for such events.

The closest the complaint comes to showing parallel conduct is its general allegation that no NFL team pays cheerleaders for rehearsals (*id.* at 13). Plaintiff's broad theory of conspiracy, however, does not turn merely on rehearsals. Rather, it is that defendants agreed to

8

a comprehensive scheme to suppress cheerleader wages on multiple fronts, including for NFL games, community events, and photo shoots. As to the majority of plaintiff's accusations under this supposed umbrella scheme, the complaint either lacks sufficient supporting factual allegations or alleges facts tending to weigh *against* a finding of conspiracy. In light of these shortcomings and inconsistencies, it will take more than a mere allegation that no team pays cheerleaders for rehearsals to nudge the overall conspiracy across the line from *conceivable* to *plausible*. *See Twombly*, 550 U.S. at 570; *see also In re Graphics*, 527 F. Supp. 2d at 1022.

In summary, the complaint's wage-related allegations barely show minimal parallel conduct and fail to show plus factors that would support an inference of conspiracy. As the undersigned judge has previously observed in another antitrust case, allegations of not-quite parallel conduct "could possibly be indicative of a conspiracy but fall short of unusual, lockstep pricing behavior . . . competitive market forces will tend to drive the prices of like goods to the same level, so like prices on like products are not, standing alone, sufficient to implicate price-fixing." *In re Graphics*, 527 F. Supp. 2d at 1022. So too here.

### *(3) Refraining from Poaching.*

The complaint generally describes a non-poaching agreement between defendants as a key component of the alleged conspiracy to suppress cheerleader wages (*see* Dkt. No. 1 ¶ 2). This is again based only on assertions of parallel conduct, *i.e.*, that NFL teams have not attempted to poach cheerleaders from each other. Significantly, however, the complaint itself avoids alleging that poaching of NFL cheerleaders would have been the norm in a free market. In other words, for all the complaint shows, NFL teams might have had little or no desire or need to poach each other's cheerleaders anyway. The complaint does not allege, for example, that any NFL team has ever expressed interest in recruiting a competing team's cheerleader. Nor is there any allegation of a shortage of cheerleading services such that NFL teams would have needed to poach in order to field a cheerleading squad. On the contrary, the complaint actually alleges that cheerleaders "were told . . . they were lucky to be chosen, should be grateful and could be quickly replaced" (*id.* ¶ 98). There is no need to poach for positions where individuals can be "quickly replaced."

9

The opposition brief adds, "in a free market, competitive businesses compete with employees by trying to hire the highest performing employees from competitors." Thus, the opposition argues, a conspiracy is the only plausible explanation for the absence of cheerleader poaching within the NFL (*see* Dkt. No. 21 at 15–16). This argument provides the sole basis for plaintiff's assertion that the absence of poaching among defendants is a product of unlawful and anticompetitive behavior. Arguments in a brief, however, are not a substitute for well-pled factual allegations in the actual complaint.

### *(4)* *Prohibitions on Seeking Employment and Discussing Earnings.*

The complaint contains several conclusory assertions that defendants agreed to prohibit cheerleaders from seeking employment with other professional cheerleading teams (Dkt. No. 1 ¶¶ 2, 78, 80) and from discussing their earnings with each other (*id.* ¶¶ 2, 80). But the complaint contains no factual allegations actually answering the basic questions of "who, did what, to whom (or with whom), where, and when" as to these prohibitions imposed on cheerleaders — even though cheerleaders like Kelsey K. should have first-hand knowledge of and be able to plead specific factual allegations about the prohibitions. *See Kendall*, 518 F.3d at 1047–48. Given the absence of such factual allegations, the complaint does not support a plausible inference that defendants are liable for any unlawful agreement to prohibit cheerleaders from seeking other employment and discussing their earnings.

### **B. No Allegations of Injury to Plaintiff.**

Apart from failing to plead factual allegations of parallel conduct with plus factors sufficient to show conspiracy, the complaint also fails to plead the necessary element of injury to plaintiff Kelsey K. herself. Although plaintiff purports to represent a class, this is not yet a class action. At this stage, what matters is whether plaintiff — who worked as a cheerleader for the 49ers — can state a plausible claim for relief on her own behalf. Yet the complaint is silent on plaintiff's own experience as a cheerleader except to say (Dkt. No. 1 ¶ 7):

> 7. Plaintiff [is], and at all times mentioned herein was, a resident of Santa Clara County, State of California, and is over 18 years of age. [Plaintiff] is a former employee of Defendant 49ers. [Plaintiff] worked for the 49ers from approximately July 2013 until February 2014 as a female athlete, colloquially known as a "cheerleader", on the 49ers "Gold Rush Girls" dance team.

10

> [Plaintiff] is a trained well-rounded and multi-disciplinary dancer who spent nearly two decades training to be a ballet dancer before being employed as a female athlete with the 49ers. [Plaintiff] was injured in her business or property by reason of the violations alleged herein.

Only the last sentence of the foregoing paragraph even hints at plaintiff's individual claim for relief, and it is utterly conclusory. To survive dismissal, the complaint needs factual allegations that state a plausible claim for relief specifically as to plaintiff Kelsey K. Generalized accusations of wrongdoing against cheerleaders as a whole do not suffice. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012) (to state a Section 1 claim, a plaintiff must allege *both* that the defendant's behavior is anticompetitive *and* that the plaintiff has been injured by the anticompetitive aspect of the practice under scrutiny).

In summary, the complaint fails to state a claim for relief under Section 1 of the Sherman Act because it does not allege facts supporting a plausible inference that defendants entered into any agreement or conspiracy to unlawfully restrain trade, or facts showing that plaintiff herself suffered any harm as a result of defendants' anticompetitive conduct.

**2. CARTWRIGHT ACT CLAIM.**

Both sides agree that plaintiff's federal and state law antitrust claims are predicated on the same allegations of conspiracy (*see* Dkt. Nos. 16 at 11; 21 at 17). The complaint therefore fails to plausibly allege conspiracy under the Cartwright Act for the same reasons that it fails to do so under the Sherman Act. *See Graphics Processing Units*, 527 F. Supp. 2d at 1025.

Separately, defendants argue that, as a matter of law, the Cartwright Act does not apply to the type of conduct alleged in the complaint. This order reaches the issue because it bears on the question of whether leave to amend would be futile.

In *Partee v. San Diego Chargers Football Co.*, the California Supreme Court reversed a trial court's finding that certain NFL "operating rules" violated the Cartwright Act, holding that "the Cartwright Act is not applicable to the interstate activities of professional football." 34 Cal.3d 378, 380 (1983). Plaintiff posits that *Partee* is "limited to NFL rules promoting on-field athletic competition" and thus does not apply to cheerleaders, who do not "compete" on the field. In support of her position, plaintiff misleadingly quotes *Partee* as granting an exemption

to the Cartwright Act "to promote athletic competition by providing a means of keeping the teams on a par with each other and to foster the business success of the member teams" (Dkt. No. 21 at 17–18 (quotation omitted)).

Actually, the pertinent passage reads:

> To promote athletic competition by providing a means of keeping the teams on a par with each other and to foster the business success of the member teams, the NFL has certain operating rules, many of which are embodied in the NFL constitution and bylaws. Partee's antitrust action concerns five of these operating rules [found] to violate California antitrust laws.

*Partee*, 34 Cal.3d at 381. Contrary to plaintiff, *Partee* did not grant an exemption to the Cartwright Act solely for the purpose of promoting on-field competition in professional football. Rather, as the decision itself makes clear, the rationale behind the exemption is that the nationwide league structure of professional football requires nationally uniform regulation such that "the burden on interstate commerce outweighs the state interests in applying state antitrust laws" to that structure. *Id.* at 385.

In short, interstate commerce, not on-field competition, is the driving force behind *Partee*. And interstate commerce, unlike on-field competition, may encompass the NFL's employment of cheerleaders. Indeed, the complaint accuses the NFL of anticompetitive conduct based in part on a contract-filing requirement in its constitution and bylaws — precisely the kind of "operating rule" *Partee* sought to exempt. Possibly, *Partee* would compel rejection of plaintiff's Cartwright Act claim here.

That being said, *Partee* involved football players, not cheerleaders, and considered different factual allegations of anticompetitive conduct than those raised by plaintiff here. The question of whether, under these particular circumstances, the burden on interstate commerce would outweigh California's interests in applying the Cartwright Act to defendants' alleged conduct is therefore a fact-intensive inquiry not susceptible to adjudication based solely on plaintiff's complaint (which, as stated, provides sparse factual allegations). *See Dang v. San Francisco Forty Niners, Ltd.*, No. 5:12–CV–05481–EJD, 2014 WL 4275627, at *4–5 (N.D. Cal. Aug. 29, 2014) (Judge Edward Davila). Accordingly, this order concludes that leave to amend would not necessarily be futile on account of *Partee*. This is without prejudice to defendants

reviving this issue at a later time with the benefit of adequate factual allegations or a factual record that would permit the full analysis required by *Partee*.

\* \* \*

In the event that defendants' motion to dismiss is granted, plaintiff requests "at least 120 days to conduct discovery" before she amends her complaint (Dkt. No. 21 at 19). (No specific discovery is itemized in the request.) Defendants respond that discovery should be denied because the complaint is "so weak that any discovery at all would be a mere fishing expedition" (Dkt. No. 22 at 6). As *Twombly* cautioned, "proceeding to antitrust discovery can be expensive," and "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." 550 U.S. at 558–59 (citations omitted). To avoid the potentially monumental expenses of antitrust discovery here until a plausible claim for relief is pled, no discovery will be allowed for now.

**CONCLUSION**

For the foregoing reasons, defendants' motion to dismiss is **GRANTED**. Plaintiff may move to file an amended complaint by **JUNE 15 AT NOON**. Any such motion should include as an exhibit a redlined version of the proposed amended complaint that clearly identifies all changes from the initial complaint. This order has illuminated certain items missing from the complaint. But it will not necessarily be enough to add a sentence parroting each missing item identified herein. Depending on context, more details may be necessary to show "who, did what, to whom (or with whom), where, and when," especially for facts that are within the personal knowledge of cheerleaders like plaintiff or facts that one would ordinarily expect to be uncovered by reasonable pre-filing investigation. In the proposed amended complaint, plaintiff should be sure to plead her best case.

**IT IS SO ORDERED.**

Dated: May 25, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

13